UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: CR 06-656(A)SVW |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANTS' |
| | ) | MOTION TO DISMISS FOR FAILURE |
| v. | ) | TO PRESERVE EXCULPATORY |
| | ) | EVIDENCE AND PRE-INDICTMENT |
| GEORGE TORRES-RAMOS, et al., | ) | DELAY |
| | ) | [341] |
| Defendants. | ) | |

///

///

## I.  INTRODUCTION

Defendants George Torres-Ramos, Mario Solano, and Carlos Montorrosso ("Defendants") move to dismiss extortion allegations in Counts I and II of the First Superseding Indictment based on alleged violations of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution for the failure to preserve and disclose exculpatory evidence as well as pre-indictment delay.  (Mot., at 1.) The Government opposes dismissal of the extortion allegations and contends that there were no constitutional violations in the activities of its officers.  For the reasons set forth below, the Court DENIES Defendants' Motion.

## II.  STATEMENT OF FACTS

A detailed factual background of this case was previously presented in the Court's Order Denying Defendants' Motions to Dismiss the First Superseding Indictment.  The Court, accordingly, will focus only on the facts relevant for purposes of this motion.  On March 2, 2005, Gregory Kading, a detective with the Los Angeles Police Department, submitted an affidavit in support of a search warrant of the Numero Uno supermarkets.  (Def Ex. A, "Affidavit".)  In his affidavit, Detective Kading stated that the "Numero Uno market and its employees frequently and routinely engage in felonious violations of [Cal.] Penal Code Section 236 (False Imprisonment), and [Cal.] Penal Code Section 146 (Arrest without process or authority)."  (Id. at 6.)  Detective Kading also stated that it was his belief that

"Rory Leidelmeyer has violated Penal Code Section 538d (Impersonating an officer)." (Id.)   The search warrant specified the items for seizure as:

> Photographs depicting any persons detained for real or perceived crimes committed at any of the Numero Uno Markets listed above.

> Any written documentation, such as, but not limited to, daily logs, related to the detention of individuals occurring at the Numero Uno Markets.

(Id. at 1.)  The Honorable Judge David Horwitz of the Los Angeles County Superior/Municipal Court authorized the search warrants at eight Numero Uno markets on the same day.  The search warrants were then executed on March 8, 2008 by Detective Kading.  (Kading Decl., ¶ 2.)  During the course of the search, a variety of items were seized, and on March 18, 2005, Detective Kading filed returns to the search warrants.  (Id.)  Detective Kading returned a number of the seized items to Joe Torres, an employee of the Numero Uno markets, on March 24, 2008.  Among those items returned were:

> 1.  A manila envelop consisting of numerous blank LAPD style "Follow up" reports, and LAPD "Continuation" sheets.  Also included are LAPD "Private Persons Arrest Reports."

> 2.  (2) Food Inspection Reports

> 3.  Blank "Application for Hire" forms.

> 4.  Civil Suit Report (Plaintiff-Viviana Villalobos) Case # BC217369

> 5.  A manila envelope containing security guard information.

> 6.  (2) black "Composition Book" containing miscellaneous notes.

7.   A manila envelope labeled "Accidentes En el La Tienda y orros Papeles."

8.   A manila envelope labeled "Receipt for Property Taken."

9.   A manila envelope labeled "Shoplifter reports."   The reports in this folder are completed LAPD "Private Persons Reports" containing officers names.

10.   (5) Fuji VHS tapes containing store surveillance.

11.   "1 shot" instamatic camera – no film. [Handwritten] (Def. Ex. D.)   The form describing the items returned by Detective Kading stated that the items were "perceived to have no evidentiary value."   (Id.)   At some point following the return of these items, Defendants contend that the items were destroyed on the basis of their declared irrelevance.   (Joe Torres Decl, ¶ 3.)   The initial indictment in this case, containing, in part, allegations of extortion and intimidation, was returned by a grand jury on August 29, 2006.   (Kading Decl., ¶ 5.)   The Government then filed a First Superceding Indictment.   Defendants filed a Motion to Dismiss the First Superceding Indictment for failure to properly allege a RICO action, which the Court denied. [Doc. No. 362]   Defendants now bring this Motion to dismiss allegations relating to the extortion and intimidation of shoplifters in Counts I and II of the First Superseding Indictment.

///

///

**III.   ANALYSIS**

Defendants move to dismiss the extortion allegations in Counts I and II of the First Superseding Indictment premised on the Government's failure to preserve allegedly exculpatory evidence. (Mot., at 4.)  The exculpatory evidence is allegedly those documents that were returned to Joe Torres by Detective Kading after the search; specifically, Defendants argue that the shoplifter reports were facially exculpatory and that the manila envelope containing security guard information along with the composition notebooks and security tapes were potentially exculpatory.  Such evidence, Defendants assert, vitiates any claim of illegality surrounding their policy of detaining shoplifters in the store.  Defendants argue that the Government failed to properly preserve the allegedly exculpatory evidence, and therefore violated their due process rights.  (Id.) Defendants claim, as a separate matter, that the Government delayed in bringing its charges for approximately two years after the return of the items involved, and, in doing so, ensured their destruction. (Id.)  The Court will analyze Defendants' arguments separately as they pertain to distinct Constitutional theories.


**A.  Government's Duty to Preserve Material Exculpatory Evidence**


The Due Process Clauses of the Fifth and Fourteenth Amendments impose upon the federal government and the state a duty to disclose and provide defendants with material exculpatory evidence.  Brady v. Maryland, 373 U.S. 83, 97 (1963); Illinois v. Fisher, 540 U.S. 544,

547 (2004).  Where the court determines that there was a failure to disclose such evidence, the good or bad faith of the prosecution is irrelevant.  Brady, 373 U.S. at 83; United States v. Agurs, 427 U.S. 97 (1976).  "A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed."  California v. Trombetta, 467 U.S. 479, 485 (1984) (citing Brady, 373 U.S. at 87).  See also United States v. Sherlock, 962 F.2d 1349, 1355 (9th Cir. 1992).  Apart from any request made by the defendant, there is a duty on the part of the prosecution "to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt."  Trombetta, 467 U.S. at 485 (citing United States v. Agurs, 427 U.S. 97, 112 (1976)).

Defendants' argument, however, is not that the Government failed to turn over exculpatory evidence, but rather that the evidence turned over to Joe Torres was patently exculpatory and, therefore, the Government was under a duty to preserve the evidence in accordance due process protections under Brady and its progeny.  In Trombetta, the Supreme Court found that the United States Constitution requires the Government to preserve evidence "that might be expected to play a significant role in the suspect's defense." 467 U.S. at 488.  The Court noted, however, that the duty of preservation applied only in those cases where the evidence is material – where it "possesses an exculpatory value that was apparent before the evidence was destroyed" and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  Id. at 489.  The Ninth Circuit has

continually required materiality in reviewing such preservation claims by Defendants.  See, e.g., Grisby v. Blodgett, 130 F.3d 365, 371 (9th Cir. 1997) ("The duty to preserve evidence is limited to material evidence, i.e., evidence whose exculpatory value was apparent before its destruction and that is of such nature that the defendant cannot obtain comparable evidence from other sources.") (citing Trombetta, 467 U.S. at 489).[1]  Exculpatory evidence is defined as "[e]vidence tending to establish a criminal defendant's innocence."  Black's Law Dictionary 557 (7th Ed. 1999).  In Brady, the Supreme Court defined such a category of evidence as that which is "favorable to the accused" and "material either to either guilt or to punishment."  373 U.S. at 87.  Accordingly, for a due process violation to exist on the duty to preserve under Trombetta, Defendants must meet the two prongs outlined in the case law.

    1.  Whether the evidence was exculpatory before its destruction

     The first prong requires that the evidence destroyed was facially exculpatory – it was evidence whose exculpatory value was obvious prior to its destruction.  Defendants argue that item 9, the LAPD Private Person's Arrest Reports, is facially exculpatory evidence in the instant prosecution.  Defendants contend that in an

---

[1] As further discussed below, the Ninth Circuit also stated, "'[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'"  Grisby, 130 F.3d at 371 (quoting Arizona v. Youngblood, 488 U.S. 51, 58 (1988)).

investigation of "whether the defendants were acting lawfully in their treatment of shoplifters, the fact that the stores were calling the police is transparently exculpatory." (Mot., at 11.) Defendants assert that such evidence would lead the defense to critical witnesses. The Government, on the other hand, claims that it does not dispute that Numero Uno employees did, in some cases, act lawfully and call the police to arrest shoplifters. (Opp., at 7.) Rather, the Government argues, the Defendants' conformity with the law in some instances does not detract from those situations in which they allegedly violated the law by holding shoplifters for long periods of time, inflicting gratuitous violence, and occasionally extorting shoplifters. (Id.) Accordingly, as an initial matter, the Government argues that the destroyed records in item 9 do nothing to refute the violations on which the case is based.

Defendants cite a number of cases where the evidence at issue was deemed apparently exculpatory and amounted to a violation of due process. See, e.g., Olszewski v. Spencer, 369 F. Supp. 3d 113, 127 (D. Mass. 2005) (finding apparent exculpatory value in alibi witness's first statement to police, which placed Defendant at location other than scene of the crime and police allowed the witness to destroy that statement) aff'd on other grounds in Olszewski v. Spencer, 466 F.3d 47, 59 (1st Cir. 2006) (denying claim under Trombetta due to petitioner's inability to demonstrate "comparable evidence" was unavailable and declining to address exculpatory nature of evidence). Such evidence, however, is distinct from that at issue in the instant action. The Government does not dispute that Defendants acted in accordance with the law on numerous occasions;

indeed the Government acknowledges that Defendants likely have evidence of such compliance in their records or with the LAPD. Instead, the Government asserts that whatever the nature of the reports to the LAPD were, they do not relate to those instances alleged where Defendants failed to report the incidents to police. Defendants contends that it is the nature of the charge in this case, one of RICO conspiracy through acts of extortion that make this evidence apparently exculpatory. In rebuttal, Defendants state, "[i]f the defendants were charged with individual acts of extortion, their legal behavior towards shoplifters on other occasions (and failure to commit extortion) might be of little significance. However, because the charge concerns an alleged policy, this evidence clearly rebuts the allegation in the indictment that an extortion strategy existed." (Reply, at 4.)

In the instant matter, the records containing shoplifter reports may or may not be favorable to Defendants. The evidence may show that, on occasion, individual shoplifters were reported to the LAPD, but it may just as easily demonstrate that there were numerous occasions where the individuals were not reported. Given the nature of the allegations in this case – that Defendants both would properly report some shoplifters to the LAPD and would improperly extort money from other shoplifters – the records of some shoplifters is not facially exculpatory. As the Government states in its Opposition, "[t]he government does not dispute that Numero Uno employees did, in some instances, act lawfully in carrying out detentions and calling the police to arrest shoplifters. That fact, however, does not detract from the fact that on other occasions, Numero Uno employees

held detainees . . . and sometimes extorted shoplifters and their family members." (Opp., at 7.) Evidence that Defendants, at times, reported to shoplifters to the LAPD and did not engage in the hard-line tactics alleged by the Government does not provide facially exculpatory evidence of the incidents when Government alleges such tactics did occur. Defendants have presented no evidence or argument that the instances described in item 9 would rebut the specific allegations of times that Defendants allegedly engaged in wrongful tactics. This case is not analogous to the situation presented in Olszewski where the evidence was the alibi of the defendant in the prosecution before the court. Here, as argued by Defendants, the evidence is not rebutting the specific allegations, but rather to show that on occasion they complied with the law. Defendants, accordingly, fail to meet their burden in establishing the facially exculpatory nature of the evidence at issue. Even if Defendants were to establish that the evidence is facially exculpatory, there two further deficiencies in establishing a Trombetta violation.

### 2.  Reproduction of the evidence

The Government argues that even were the evidence exculpatory at the time it was destroyed, there is no reason Defendants cannot recover the very same reports on file with the LAPD. Item 9 contained copies of the LAPD Private Persons Arrest Reports that Defendants claim are not otherwise recoverable. Defendants acknowledge that they have evidence of the police response to shoplifters between January 2004 and March 2005 through wiretap

records. (Mot., at 13.)  Defendants argue, however, that due to the

destruction of the evidence, they no longer have the evidence of the

events pre-dating 2004.  In response the Government asserts that this

information is on file with the LAPD and that such evidence can and

has been reproduced for Defendants.  (Opp., at 7-8.)  Furthermore,

the Government argues, if the defendants "believe that acting

lawfully on some occasions is relevant to show they did not act

unlawfully on others," Defendants already possess such evidence.

(Id.)  Defendants argue, however, that given the length of period

covered in the First Superseding Indictment, the evidence they have

is limited to certain time frames, and certainly does not cover the

alleged period of misconduct between 1986 and 2005.  (Reply, at 4.)

Additionally, The LAPD Private Person's Arrest Reports that

Defendants have been able to obtain through the issuance of subpoenas

date back only as far as 1993 and that the Government has failed to

produce any of these reports through the process of discovery.

(Reply, at 4-5 n.2.)

     Insofar as Defendants assert that their compliance with the law

on some occasions vitiates any allegations of a policy, the allegedly

exculpatory evidence is recoverable through other means.  Defendants

acknowledge that they have evidence of police response to shoplifters

from 2004 to 2005 through the Government's wiretap evidence.

Additionally, Defendants have, or can also obtain, LAPD Private

Person's Arrest Reports dating back to 1993.  (Reply, at 4 n.2.)[2]  If

---

[2] If Defendants mean to argue, as to the disclosure of evidence,
that the Government has failed to meet its obligations to turn
over evidence it retains within its possession, it should file a
motion outlining such a claim.

Defendants simply assert that their reporting of shoplifters to the police contradicts the allegations made by the Government, then the evidence exists in a comparable, recoverable form.  Although the records may not date back to the start date of the allegations, they do cover periods of time within the First Superceeding Indictment. Accordingly, the Court finds that Defendants fail to satisfy the second prong of Trombetta.


### 3. Destruction of evidence by third party


In the instant prosecution, it was, according to declarations filed by both parties, not the Government who destroyed the evidence, but rather an employee of the Numero Uno Markets who eventually disposed of the records.  Defendants assert that the destruction of the evidence only came as a result of the statement provided by Detective Keading that the materials were of "no evidentiary value." On that account, Joe Torres claims that he destroyed the relevant materials.   Neither Defendants nor the Government have cited any cases to this Court involving the destruction of evidence by a third party in similar circumstances within the Ninth Circuit.   The Government points to precedent describing the Fifth Amendment rights as protecting against government actions, and not those of private citizens.  See, e.g., Castillo v. McFadden, 399 F.3d 993, 1002 n.5 (9th Cir. 2005) ("The Fifth Amendment prohibits the federal government from depriving persons of due process."); Geneva Towers Tenants Org. v. Federated Mortgage Investors, 504 F.2d 483, 487 (9th cir. 1974) ("The Due Process Clause of the Fifth Amendment applies to

and restricts only the federal government and not private persons.").
The Government contends that it returned the items to Joe Torres
believing they were not relevant to the investigation and at that
point Defendants could choose to doe whatever they wished with the
items.  Defendants essentially argue that they relied on the
representation that these items were of no value to the investigation
in destroying them, only to find out that they later were of value.

Both parties note prior decisions in the First Circuit as well
as the Tenth Circuit.  In United States v. Sepulveda, the Government
returned inspected phone records to the defendant's housemate who
then destroyed those records.  15 F.3d 1161, 1195 (1st Cir. 1993).
The defendant argued that the government failed to adequately protect
against the destruction of these records, which defendant asserted
were necessary for his defense.  Id.  The First Circuit, however,
held that the government was not liable because it lacked any
knowledge that the housemate would destroy the documents.  Id.  The
First Circuit premised its finding on the lack of bad faith on the
part of the officers returning the items.  The First Circuit stated,
"[i]n the situation at hand, the government did not destroy the
records [defendant] seeks but merely returned them to [the]
residence. There is no hint of bad faith and no indication that the
agents knew, or should have anticipated, that [the] friend would
thereafter discard them. Accordingly, [defendant's] motion is best
regarded as a throwaway."  Id.  In United States v. Vap, the Tenth
Circuit held that the Government was not liable where business
records subsequently turned over to third parties were destroyed
because the perjury charge against the defendant was filed after the

records were returned and defendant received a summary of their contents.  852 F.2d 1249, 1256 (10th Cir. 1988).  The court's holding in Vap is facially distinguishable due to the timeline of events occurring in that case.  The First Circuit in Sepulveda, however, did approach a similar situation and noted the lack of bad faith.  Such an interpretation of third-party destruction of evidence is rational. Certainly the protections of the Fifth Amendment arise from the Government actions and not those of private parties, but the Government cannot expunge any tarnish on its actions by simply laundering actions through a third party.  If the Government could engage in such a practice, then its direction of a third party to engage in the destruction of evidence would absolve it of any wrongdoing.  Courts generally infer bad faith from the circumstances surrounding the destruction of potentially exculpatory evidence. See, e.g., United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993) (finding that Government's failure to preserve laboratory equipment seized from defendants was in bad faith where prosecution was for offenses relating to manufacture of methamphetamine; the equipment's value as potentially exculptory was repeatedly suggested to government agents; defendants repeatedly asserted their plant lacked the capabilities to manufacture methamphetamine; and there were no comparable means to support assertions of innocence).  The Ninth Circuit has also repeatedly distinguished between acts of mere negligence and those of bad faith.  See, e.g., Mitchell v. Goldsmith, 878 F.2d 319, 322-23 (9th Cir. 1989) (finding that lost photographs

from lineup where victim failed to identify assailant may have been
negligence, but there was no evidence to demonstrate bad faith).[3]

Here, Detective Kading merely returned the items in question and
stated that they were "perceived to have no evidentiary value."  The
Government did not tell Defendants to destroy the documents nor is
there any evidence that Detective Kading knew what Joe Torres would
do with these documents.  These documents may still have been
relevant to the Defendants' operation of their business – indeed, if
the documents dated back to the 1980s there is no specific reason why
they would be discarded when handed back as opposed to simply filed
away.  Detective Kading did not tell the Defendants what they should
do with the documents, but merely stated that they were of no
perceived relevance to the investigation.  Defendants have not cited
any authority demonstrating that in situations such as the one before
this Court, the Government is responsible for the destruction of the
documents.  This is also not a case such as Cooper, where the
Government was repeatedly told of the importance of the evidence in
the defendant's case and chose to destroy the evidence anyway.  In
light of the lack of authority, and the absence of any bad faith
actions by the Government or Detective Kading, or any encouragment
Joe Torres or the Defendants to destroy the documents, the Government
should not be held responsible for Joe Torres's destruction of the
records.  Accordingly, even were the two prongs of Trombetta
satisfied, the Government's actions in this case would not rise to
the level of destruction of evidence.

---

[3] Although these cases involve "potentially exculpatory" evidence, they
are instructive insofar as they note the lack of bad faith in the
police's relinquishment of evidence to a third-party.

**B.  Government's Duty to Preserve "Potentially" Exculpatory Evidence**

There is, however, a separate standard set forth by the Supreme Court for lost or destroyed evidence whose value is not "apparent," but rather is merely "potentially exculpatory."  The Supreme Court discussed the difficulty in divining a meaning from lost evidence when it stated: "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and very often disputed." Trombetta, 467 U.S. at 486.  In Arizona v. Youngblood, 488 U.S. 51 (1988), the Supreme Court was presented with the police's failure to preserve blood and semen samples taken from a rape victim.  The police investigator failed to properly refrigerate the samples so as to allow the defendant in the case could conduct his own tests on the samples.  Youngblood, 488 U.S. at 53-54.  The Supreme Court noted in its opinion that the evidence did not rise to the level of "apparent" exculpatory evidence. Id. at 56 n.*.  The Supreme Court held that, in cases involving only potentially exculpatory evidence, "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58.[4]  The Ninth

---

[4] In its reasoning, the Supreme Court explained:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might

Circuit therefore distinguishes those cases involving facially exculpatory evidence from those cases where the evidence is only "potentially" exculpatory.  <u>See</u> <u>United States v. Estrada</u>, 453 F.3d 1208, 1212 (9th Cir. 2006) (drawing a distinction between "potentially" exculpatory evidence and "apparently" exculpatory evidence) *cited with approval in* <u>Richter v. Hickman</u>, 521 F.3d 1222, 1234 (9th Cir. 2008);[5] <u>United States v. DeGeorge</u>, 380 F.3d 1203 (9th

_____

have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in [<u>Trombetta</u>, 467 U.S., at 486], that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." <u>Youngblood</u>, 488 U.S. at 57.

[5] Although the Ninth Circuit in <u>Richter</u> is less than clear concerning the distinction between the two formulations of exculpatory evidence – indeed, referring to the rule as the <u>Trombetta-Youngblood</u> rule – it does note the distinction between the "apparently" and "potentially" exculpatory evidence.  In <u>Richter</u>, the Ninth Circuit confronted the issue of evidence that was lost by the police and then later recovered after trial and found to have exculpatory value.  521 F.3d at 1235.  The Ninth Circuit found that there was no bad faith in the police officer's behavior and that "[t]he post-trial retrieval of the floorboard does not entitle appellants to a retroactive determination that [the investigator] violated appellants' due process rights by inadvertently losing or misplacing the evidence." <u>Id.</u>  Other Ninth Circuit decisions have been equally ambiguous on the distinction between <u>Trombetta</u> and <u>Youngblood</u>.  <u>Compare</u> <u>United States v. Cooper</u>, 983 F.2d 928, 931 (9th Cir. 1993) ("In <u>Arizona v. Youngblood</u> . . . the Court added the additional requirement that the defendant demonstrate that the police acted in bad faith in failing to preserve the potentially useful evidence.") <u>with</u> <u>United States v. Estrada</u>, 453 F.3d 1208, 1212 (9th Cir. 2006) ("In <u>Arizona v. Youngblood</u> . . . the Court further held that where lost or destroyed evidence is *deemed to be only potentially exculpatory, as opposed to apparently exculpatory*, the defendant must show that the evidence was destroyed in bad faith.") (emphasis added).  Despite this confusion it would appear that however the tests are distinguished both would inherently involve bad faith on the part of the Government.  If the evidence was both apparently exculpatory and irreplaceable, and the Government destroyed such evidence, then it would seem logical to infer, in

Cir. 2004) ("government has no obligation under the due process clause to preserve 'potentially useful' evidence, particularly where there is no showing of bad faith.") (citations omitted); <u>Mitchell</u>, 878 F.2d at 322-23(failure to preserve lineup photographs did not deprive defendant of due process where the evidence was potentially useful but there was no evidence of bad faith); <u>United States v. Belden</u>, 957 F.2d 671 (9th Cir. 1992) (where evidence potentially exculpatory destroyed, defendant must establish bad faith on part of police officers). Courts have inferred bad faith from the circumstances surrounding the destruction of potentially exculpatory evidence. <u>See, e.g.</u>, <u>Cooper</u>, 983 F.2d at 931 (Government's failure to preserve laboratory equipment seized from defendants was in bad faith where prosecution was for offenses relating to manufacture of methamphetamine; the equipment's value as potentially exculptory was repeatedly suggested to government agents; defendants repeatedly asserted their plant lacked the capabilities to manufacture methamphetamine; and there were no comparable means to support assertions of innocence.) Accordingly, where evidence is only potentially exculpatory, as opposed to apparently exculpatory on its face, the Court must analyze whether the destruction was undertaken in bad faith.

Defendants identify three items on the list as potentially exculpatory: a manila envelope containing security guard information; (2) black composition books containing miscellaneous notes; and (5) Fuji VHS tapes containing store surveillance. (Reply, at 5.) The Court will address each one of these three items for their

_____

many cases, bad faith from the actions of the Government.

potentially exculpatory value, and then address whether bad faith exists on the part of the Government.

### 1.  Security guard information

Item number 5 on the returned items list is a manila envelop containing security guard information.  In their Opposition, Defendants state: "[a]lthough the envelope and its contents were returned, in fact, photocopies of the documents were kept.  These documents provided identifying information of current and former store security guards who were expected to have knowledge of shoplifter detentions." (Opp., at 4.)  Accordingly, Defendants are willing to withdraw their claim as to this item on the condition that such information is turned over to them. (Reply, at 5.)  The Government, as it has stated that it possesses such information and is willing to provide copies of this information, are to turn over the evidence in light of Defendants' request.

### 2.  Composition notebooks and VHS tapes

The next pieces of disputed evidence are two black composition notebooks that containing miscellaneous notes and VHS security tapes of the Numero Uno markets.  In his declaration, Detective Kading states that the notes in the composition book did not pertain to shoplifters and were returned. (Kading Decl., ¶ 4f.)  Detective Kading further declares that the five VHS tapes seized contained static surveillance from security cameras that did not depict any

shoplifters, detainees or unlawful criminal activity. (Id., at ¶4j.) Accordingly, the Government initially asserts that the evidence did not relate to any of the investigation matters; hence, it is not potentially exculpatory. Second, the Government maintains that it turned all of this back over to Defendants and there was no bad faith in their actions, as required under Youngblood.

Defendants first argue that the Court cannot rely on the declaration of Detective Kading as to the exculpatory nature of these items. (Reply, at 6.) Defendants contend that Detective Kading has, on multiple occasions, misrepresented facts to the Court concerning both discovery and non-discovery matters.[6] Additionally, Defendants argue that the second prong of the Youngblood test is met here due to the bad faith of the Government. Defendants point to alleged deficiencies in the affidavit for the materials seized in the search warrant; documents were returned that the Detective Kading represented had no evidentiary value, only to discover their value at a later point; the Government knew that the search warrant was sealed and the true scope of the investigation would not be understood by Defendants until after the unsealing of the indictment. (Reply, at 7-8.)

---

[6] In the first instance, Detective Kading allegedly misrepresented conversations between Rory Leidelmeyer and Manual Torres in his affidavit for the search warrant to seize these items. (Reply, at 6.) This subject is argued in the contemporaneous Motion to Suppress brought by Defendants. The second instance occurred in the fall of 2007, when defense counsel alleges that it inquired as to whether there were any copies of the returned items and Detective Kading told them that he did not make any. As stated in his declaration, this does not appear to be accurate with respect to item 5. The third instance concerns certain representations of conversations that Detective Kading made at George Torres's bail hearing, which later turned out to be inaccurate.

As to the deficiencies in the warrant application, these arguments are addressed in the concurrent Motion to Suppress brought by Defendants.  Given the declaration of Detective Kading, there was likely no exculpatory evidence in the composition notebooks or on the VHS tapes.  Even if there were potentially exculpatory evidence in these items, the parties again dispute whether the Government could be responsible for the destruction of evidence turned over to third parties.  There is an absence of authority on this issue, as discussed above, but what little authority there is would suggest that such a determination turns on the bad faith of Detective Kading or the Government in returning such evidence.[7]  See, e.g., United States v. Estrada, 453 F.3d 1208, 1212-13 (9th Cir. 2006) (stating, in case where third party towing company sold truck at dispute, "[g]iven that the truck was at most only potentially exculpatory evidence, Estrada must show bad faith on the part of the government.  Here, there is no such showing, as there is no showing that the government knew or intended for the truck to be sold by the towing company, let alone that the government did so with a malicious intent.")  As stated previously, the Court does not find that the Government's actions in turning over the items and stating that they were perceived to have no evidentiary value rising to the level of bad faith.  The officer returning the items did not indicate that the

_____

[7] Defendants, in their Motion to Dismiss, also argue that the Government did not fulfill its duty to produce exculpatory evidence.  The Government, as discussed above, does have a duty to produce exculpatory evidence, but Defendants' argument is merely premised on the Government's destruction of the evidence. (Def. Mot., 15-16 (citing United States v. Dupuy, 760 F.2d 1492, 1501 n.3 (9th Cir. 1985).)  It is therefore duplicative of the prior two arguments discussed in Part III.

items should be destroyed, nor did the officer have any reason to
believe that they would be destroyed.  Indeed, given the length of
time Defendants allege they retained these records, it would just as
likely, if not more likely, that Defendants would continue to hold
these records for their own benefit.  There is no indication that, by
turning the evidence back over to Joe Torres, that Detective Kading
acted in bad faith.

**C.  Pre-Indictment Delay**

     Defendants additionally argue that the Government's two-year
delay in issuing the Indictment violates the Due Process Clause of
the Fifth Amendment and, therefore, requires dismissal.  "The Fifth
Amendment guarantees that defendants will not be denied due process
as a result of excessive preindictment delay."  United States v.
Sherlock, 962 F.2d 1349, 1353 (9th Cir. 1989).  For delay in the
issuance of an indictment, courts employ a two-pronged test.  The
defendant must first prove that he suffered "actual, non speculative
prejudice from the delay."  Id. (citing United States v. Lovasco, 431
U.S. 783, 789; United States v. Moran, 759 F.2d 777, 782 (9th Cir.
1985)).  This is a heavy burden, which requires the defendant to
provide definite, non-speculative proof that the loss of evidence was
prejudicial to his case.  Moran, 759, F.2d at 782 (citations
omitted); United States v. Contreras, 63 F.3d 852, 855 (9th Cir.
1995) (quoting United States v. Gonzalez-Sandoval, 894 F.2d 1043,
1050 (9th Cir. 1990)).

22

Defendant must prove, as the second prong of the test, that the length of the preindictment delay offends "fundamental conceptions of justice which lie at the base of our civil and political institutions." Lovasco, 431 U.S. at 790. The Supreme Court has stated, however, that "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with the prosecutor's judgment as to when to seek an indictment." Id. The prosecution may defer filing an indictment until such as it has assembled sufficient evidence to prove guilt beyond a reasonable doubt. Id. at 793. The Supreme Court's reluctance to tread into the discretion of the Government in the prosecution of cases has held courts to generally look for some form of bad faith or inexcusable delay in failing to bring the indictment in a timely manner. See, e.g., United States v. Erickson, 472 F.2d 505, 507-508 (9th Cir. 1973) (finding that the government did not intentionally or negligently delay in efforts to investigate); United States v. Alameh, 341 F.3d 167, 176 (2d Cir. 2005) (finding a lack of due process violation in 10-year delay where the delay was not intended for tactical advantage or harassment); United States v. Beckett, 208 F.3d 140, 150-51 (3d Cir. 2000) (six month preindicment delay due to legitimate investigation); Howell v. Barker, 904 F.2d 889, 895-96 (4th Cir. 1990) (no valid justification for preindictment delay in case that was not particularly complication).

Defendants argue that they suffered real adverse prejudice because the lost evidence in this case "meaningfully impairs the [D]efendants' ability to present a complete defense." (Mot., at 18.) Defendants assert that, as a result of the delay, the evidence

23

discussed above was destroyed.  The Government again argues that the evidence can be reproduced, even if not in full, through other avenues such as wiretaps and police reports that demonstrate Defendants did report shoplifting to the police.  (Opp., at 15.) Despite maintaining the alternate forms of recovery, however, the Government "persists . . . in its belief that proof that defendants were acting lawfully on some occasions is not relevant to disproving the occasions on which they violated the law." (Id. at 16.)  This argument essentially rehashes the dispute presented above.  In some respects, however, the delayed indictment presents a separate causal question.  Defendants claim that the allegedly relevant documents were destroyed as a result of the representations that were made by Detective Kading, not out of any delay in bringing the Indictment. As stated in Lovasco, the actual prejudice must arise "from the delay."  431 U.S. at 789.  Defendants simply assert that the documents were destroyed some time after they were returned, on the basis of their perceived irrelevance, which is not the same as destruction based purely on the delay in bringing the indictment.

Even if the Court were to determine that Defendants suffered prejudice by the delay, the delay does not reach the level of a Fifth Amendment Due Process violation.  Defendants argue that the two-year delay in issuing the indictment offends fundamental concepts of justice.  Defendants, however, offer little support for their proposition considering the overarching nature of the RICO allegations at issue in this case.  Defendants merely state, "there is no rational justification for the government's delay in seeking the indictment."  (Mot., at 18.)  Defendants focus narrowly on the

evidence gathered for the extortion charges brought in the indictment and cite the length of time between the investigation of that charge and the indictment as the basis of their claim.  Such an interpretation, however, takes an unnecessarily obtuse view of the Government's charges in this case.  The standard is whether there was some form of dilatory or deceptive nature to the Government's delay in bringing an indictment.  In this case, the Government is alleging that these extortion acts are a part of the larger RICO case brought against Defendants.  Even once the information was gathered that was the subject of the searches, the Government has to investigate claims and fit those claims within the framework of an involved RICO action. As the prior motions before this Court have demonstrated, this is not a straightforward extortion case, nor is it a simple criminal prosecution.  Given the complex nature of the charges brought by the Government and the investigation undertaken, the Court cannot find that the Government intentionally or negligently delayed its investigation.

**IV.  CONCLUSION**

    For the reasons outlined above, the Court DENIES Defendants' Motion to Dismiss.


        IT SO ORDERED.


DATED:        August 12, 2008


                                              STEPHEN V. WILSON

                                        UNITED STATES DISTRICT JUDGE