UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES, | ) | CR 06-656(A) SVW |
| | ) | |
| Plaintiff, | ) | ORDER RE DEFENDANTS' MOTION TO SUPPRESS EVIDENCE |
| | ) | [338, 339] |
| v. | ) | |
| | ) | |
| GEORGE TORRES-RAMOS, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**I.   INTRODUCTION**

George Torres-Ramos ("George Torres"), Carlos Monterosso, and Mario Solano ("Defendants") bring this Motion to Suppress Evidence obtained pursuant to a search warrant ("Warrant") issued on March 2, 2005, by Los Angeles Superior Court Judge David Horowitz.  (Mot., at 6.)  For the reasons that follow, the Court finds that Defendants Mario Solano and Carlos Monterosso have standing to challenge the searches of their respective offices, and that George Torres has standing to challenge the search of the manager's office of the Alvarado Store.

1  The Court reserves judgment on whether George Torres has standing in
2  any of the other places searched, and finds that a <u>Franks</u> hearing
3  should be held to determine whether the false statements in the
4  Affidavit were made intentionally or with reckless disregard for the
5  truth.

6
7  **II.  FACTS**

8
9      The purpose of the Warrant was to seize evidence related to
10  alleged violations of California law by various Numero Uno supermarket
11  employees.  Los Angeles Police Department ("LAPD") Officer Gregory
12  Kading made a sworn Affidavit, stating that Numero Uno employees had
13  violated California law by (1) arresting shoplifters without process or
14  authority, Cal. Penal Code § 146; (2) falsely imprisoning shoplifters,
15  <u>id.</u> § 236; and (3) impersonating a police officer, <u>id.</u> § 538(d).
16  (Mot., Ex. A ("Kading Aff."), at 6.)
17      The Warrant provided for the search of Numero Uno supermarkets at
18  eight locations: (1) 9127 South Figueroa Street, Los Angeles ("Figueroa
19  Store"); (2) 1007 Cypress Avenue, Cypress Park ("Cypress Store"); (3)
20  1309 Alvarado Street, Los Angeles ("Alvarado Store"); (4) 2037 North
21  Durfee Road, El Monte ("Durfee Store"); (5) 701 Jefferson Boulevard,
22  Los Angeles ("Jefferson Store");[1] (6) 500 South Pacific Avenue, San
23  Pedro ("Pacific Store"); (7) 4373 South Vermont Avenue, Los Angeles
24  ("Vermont Store");[2] and (8) 8600 South Avalon Boulevard, Los Angeles

25  ─────────────
   [1]   George Torres maintained a personal office at the Numero Uno
26  main office immediately next door to the Jefferson Store, at 700
   East Jefferson Street.  (Further Opp'n, Kading Decl., at 6.)
27  [2]   The Vermont Store is sometimes referred to in the Kading
   Affidavit as the "Vernon Store," because it is on the corner of
28

2

("Avalon Store").  (Id., Ex. F ("Warrant"), at 2.)  The Warrant permitted the police to search "all rooms, attics, basements and other parts therein, the surrounding grounds, any garages, storage rooms, containers and out-buildings of any kind located thereon."  (Id.)

The Warrant also authorized the search of two vehicles, a 1998 Chevrolet pickup truck and a 1994 Toyota pickup truck, both belonging to Rory Leidelmeyer.  (Id.)  The Warrant further authorized police to search Leidelmeyer's person and residence located at 8137 Calmada Avenue, Whittier, California.  (Id.)

The Warrant authorized police to seize three types of evidence: (1) "[p]hotographs depicting any persons detained for real or perceived crimes committed at any of the Numero Uno Markets;" (2) "[a]ny written documentation, such as, but not limited to, daily logs, related to the detention of individuals occurring at the Numero Uno Markets;" and (3) "[a]ny authentic or replica law enforcement badge(s) within the domain of Rory Leidelmeyer."  (Id.)

On March 8, 2005, Officer Kading led the effort to execute the Warrant, seizing a variety of materials.  (Mot., at 11.)  Materials seized include numerous Polaroid photographs, notebooks, business cards, a Numero Uno identification badge, and two California identification cards belonging to unknown third persons.  (Mot., Ex. I.)  It does not appear, however, that a police badge was found in the search.  (See id.)  Approximately two weeks later, Officer Kading returned some of the materials seized to the Numero Uno markets. (Mot., at 11.)  The remaining items have been used to further

Vermont Street and Vernon Avenue.  (See Kading Aff., at 2.)

investigate the practices forming the basis of some of the charges at issue in this criminal prosecution.  (Id.)

Officer Kading's Affidavit sets out the facts upon which the probable cause for the Warrant was founded.  (Kading Aff., at 2-6.) The Affidavit states that on November 19, 2004, Officer Kading intercepted a conversation between George Torres and Rory Leidelmeyer, a Numero Uno employee.  (Id. at 2.)  During the conversation, Leidelmeyer asked George Torres if another employee, Alfredo Garcia, had informed George Torres that "we took care of somebody over there last night."  (Id.)  George Torres asked where, and Leidelmeyer told him at the Vermont Store.  (Id.)  George Torres responded that he had not heard, and said that he would call Alfredo Garcia (aka "Chicas"), to inquire about the incident.  (Id.)

The Affidavit then states that a conversation was intercepted between George Torres and Garcia the following day, November 20, in which Garcia informed George Torres that he had detained shoplifter for stealing, and had escorted him to the back of the store.  (Id. at 3.) The Affidavit quotes Garcia as stating: "And then Rory went in there and showed his PD badge and shook the guy up a little bit.  We had him there for a couple hours."  (Id.)  Based on these conversations, Officer Kading stated that he believed that there had been an assault of a shoplifter at the Vermont Store.  (Id.)  Officer Kading asked Detective James Layugan whether a police report had been filed regarding the incident, and Detective Layugan told him there had been no report.  (Id.)

On December 3, 2004, Officer Kading and another officer investigated the incident by contacting the Vermont Store manager

4

Manuel Torres.  (Id.)  Officer Kading employed an "investigative ruse," informing Manuel Torres that the alleged shoplifter and victim of the assault had been seriously injured and had filed a police report indicating that the victim had been assaulted by a muscular white male. (Id.)  Manuel Torres "denied having any male White employees who have been involved in security efforts at the market." (Id.)  After Officer Kading questioned Manuel Torres about the store's shoplifting procedures, the Affidavit states that Manuel Torres "produced a shoebox full of Polaroid pictures containing images of persons detained for shoplifting" in 2004.  (Id.)  Officer Kading stated that there were approximately 70 to 100 pictures in the box.  (Id.)  Officer Kading also stated that Manuel Torres admitted to "on occasion" using mace to apprehend several of the photographed persons.  (Id. at 3-4.)  Officer Kading reviewed the video system to find any taped evidence, but was unable to find any relevant material.  (Id. at 4.)  Officer Kading stated that he suspected George Torres had intentionally concealed unfavorable videotape footage, but provided no factual basis for this suspicion.  (Id.)

The Affidavit then asserts that, on December 9, 2004, Officer Kading and Detective Layugan again interviewed Manuel Torres at the Vermont Store.  (Id.)  The interview was surreptitiously recorded.[3] (Id.)  This time, Officer Kading mentioned Rory Leidelmeyer's first name, at which point Manuel Torres acknowledged that he knew Leidelmeyer, but asserted that Leidelmeyer could not have been involved in any such incident.  (Id.)  The Affidavit states that Manuel Torres

---

[3]    The December 3, 2004, interview with Manuel Torres was not recorded.

first identified Leidelmeyer as a district store manager, but then contradicted himself minutes later. (Id.)  Officer Kading then stated in the Affidavit that he questioned Manuel Torres about the "company policy" regarding shoplifters. (Id.)  According to the Affidavit, Manual Torres said that "they are selective in notifying/summoning law enforcement once they've detained a suspect," and "that the common response to a shoplifter is to detain him/her for approximately one hour in the back office of the store and then release them." (Id.)

The Affidavit finally discusses Detective Layugan's December 10, 2004, interview with Leidelmeyer. (Id. at 5.)  This interview was also surreptitiously recorded. (Id.)  The Affidavit states that Leidelmeyer identified himself as an inspector for the Numero Uno company and admitted to assisting in the detention of a juvenile suspected of shoplifting. (Id.)  However, Leidelmeyer is described as denying that any force or a police badge was used. (Id.)  Officer Kading asserts that Leidelmeyer stated that the "stores [sic] policy" regarding shoplifters was "typically" to take a Polaroid picture and release the suspect after one to two hours. (Id.)  Leidelmeyer also allegedly stated that the Figueroa Store "retains photographs in the same manner." (Id.)  Leidelmeyer asserted that the purpose of the photos was to allow the store security personnel to identify potential shoplifters. (Id.)  Officer Kading asserts he found this explanation implausible in light of the disorganized nature of the collection of photos and their location outside the security room. (Id.)  Officer Kading asserts that since the box contains so many pictures, arranged in a disorganized fashion, it would be by "mere chance" that the

employees would be able to find the photo and compare it to an image on the video monitor.  (Id.)

The Affidavit concludes that, on the basis of the recounted facts, Officer Kading believed that "Numero Uno market and its employees frequently and routinely engage in felonious violations" of various provisions of the California Penal Code.  (Id. at 6.)  Officer Kading noted that although arrest without process and impersonating an officer are misdemeanors, the fact that employees of Numero Uno displayed a police badge, "coupled with physical force," constitutes a felonious false imprisonment.  (Id.)  Officer Kading "requested permission the search the Numero Uno markets listed above."  (Id. at 41.)  However, the Affidavit nowhere lists the supermarkets to be searched.  Instead, Officer Kading claims that he presented the Affidavit to the Magistrate Judge with the Warrant, which lists the locations to be searched. (Kading Decl. in Further Opp'n, at 1-2.)

**III.  ANALYSIS**

Defendants George Torres, Mario Solano, and Carlos Monterosso contend that evidence should be suppressed because the searches were conducted in violation of Defendants' Fourth Amendment rights.  (Mot., at 11.)

**A.  Standing**

As a preliminary matter, the Government argues that Defendants did not suffer violations of their personal privacy rights such that they

can claim Fourth Amendment violations.  (Opp'n, at 8.)  The test for standing under the Fourth Amendment is well-established:

> To establish standing to challenge the legality of a search or seizure, the defendants must demonstrate that they have a legitimate expectation of privacy in the items seized or the area searched.  To demonstrate this, the defendants must manifest a subjective expectation of privacy in the area searched, and their expectation must be one that society would recognize as objectively reasonable.

United States v. Sarkisian, 197 F.3d 966, 986 (9th Cir. 1999) (quotations and citations omitted).  "The reasonableness of an expectation of privacy is evaluated 'either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"  United States v. Silva, 247 F.3d 1051, 1055 (9th Cir. 2001) (quoting Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978)).  Defendants bear the burden of "establishing that, under the totality of circumstances, the search or seizure violated their legitimate expectation of privacy."  Id.

Here, the Government does not directly dispute that Defendants had a subjective expectation of privacy in the items or area searched, but only whether that expectation was objectively reasonable.  (See Further Opp'n, at 10.)  As it was initially unclear where the seized items were found, and what Defendants relationship to the areas searched was, on June 30, 2008, the Court requested supplemental briefing on the issue of standing.[4]

----

[4]     Some of the stores searched had both a manager's office and a security office (e.g. Alvarado, Jefferson, and Avalon Stores). It is not entirely clear if certain photos were seized in the

1                    **1.  Mario Solano**

2

3        Mario Solano was the manager and head of security of the Alvarado

4   Store, and was present at the time it was searched on March 8, 2005.

5   (Solano Decl., at 1.)  Solano states he maintained two locked offices

6   at the store, one downstairs to conduct his managerial responsibilities

7   ("manager's office"), and one upstairs to conduct his responsibilities

8   as head of security ("security office").  (Id.)

9        The manager's office in the Alvarado Store housed sensitive

10  business materials, including a computer used for pricing inventory,

11  and a safe that contained the Store's cash receipts.  (Aug. 7 Hr'g Tr.,

12  at 24-26.)  Solano asserts that the office door was always locked, and

13  although other employees occasionally came into the office to talk to

14  him, the office was for Solano's exclusive use.  (Solano Decl., at 1.)

15  Solano claims that the only other person who has a key to the manager's

16  office was George Torres.  (Id.)  At the hearing held on August 7,

17  2008, George Torres clarified the matter stating that Joe Ramos, the

18  Numero Uno general manager, also had a key to the manager's office.

19  (Aug. 7 Hr'g Tr., at 23-24.)  George Torres also testified at the

20  hearing that no employee, including the store's price-changer Palomino,

21  was ever in the manager's office without Solano, George Torres, or Joe

22  Ramos present.[5]  (Id. at 27-

23  _____

    managers' offices or the security offices of these stores.  If

24  the parties are not in agreement regarding precisely where the
    photos were found, the Court will hold an evidentiary hearing at

25  a future date for the purpose of resolving this issue.

    [5]     Officer Kading claims that the store manager on duty at the

26  time of the search, Carlos Moran, told him that Palomino had
    access to the manager's office.  (Further Opp'n, Kading Decl., at

27  8.)  However, the Court finds George Torres's testimony at the
    hearing held on August 7, 2008, to be credible, that Palomino was

28

28.)  Moreover, Solano was the only employee at the Alvarado Store who had a combination to the safe.  (Id. at 26.)

The Alvarado Store also had a security office that was located in the back of the Store and up a flight of stairs.  (Solano Decl., at 1.) The security office contained video equipment and television monitors used to prevent shoplifting.  (Id.)  Solano claims he was the only person other than George Torres that had a key to the security office. (Id. at 2.)  As part of his duties as head of security for the Alvarado Store, Solano worked in the security office on a daily basis, checking the monitors and making sure that the video equipment was functioning properly.  (Id.)  Solano also kept documentation related to shoplifters in a file cabinet in the security office.  (Id.)

In light of these facts, the Court finds that Mario Solano had a reasonable expectation of privacy in both the manager's office and the security office in the Alvarado Store.  It has long been recognized "that in the private employer context, employees retain at least some expectation of privacy in their offices." United States v. Ziegler, 474 F.3d 1184, 1189 (9th Cir. 2007); see also U.S. v. Taketa, 923 F.2d 665, 673 (1991).  The central case addressing this issue is Mancusi v. DeForte, in which the Supreme Court found that a union employee had a legitimate expectation of privacy in records kept in an office that he shared with other union officials and that could be accessed by "union higher-ups."  392 U.S. 364, 369 (1968).  Crucially for this Motion, the

---

never in the room without George Torres or Solano present.  Moran may have had access to the manager's office as well because he was a manager of the Alvarado store and worked a different shift than Solano.  This fact, however, does not substantially change the standing analysis with regard to Solano's expectation of privacy in the manager's office.

Supreme Court "thought the fact that the office was shared with a few other individuals to be of no constitutional distinction." Zeigler, 474 F.3d at 1189.

In a subsequent plurality opinion, the Supreme Court indicated that fellow employees and supervisors' access to an employee's office may, in the public employment context, defeat an employee's reasonable expectation of privacy in that office. O'Connor v. Ortega, 480 U.S. 709, 718 (1987). However, that plurality opinion did not evidence any intent to overturn the holding in Mancusi. See id. In fact, in Ortega, the plurality noted that "[a]n office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees." Id. Thus, the plurality held that "[g]iven the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." Id.

Furthermore, while the Ninth Circuit, in the public employment context, has generally found that an employee can enjoy a reasonable expectation of privacy in the workplace "in areas given over to his exclusive use," it too has recognized that the Supreme Court in Ortega could not form a majority behind the proposition that fellow employees' access to an employee's private office "could defeat an expectation of privacy in that office." Schowengerdt v. General Dynamics Corp., 823 F.2d 1328, 1334 (9th Cir. 1987); see also Taketa, 923 F.2d at 671. Indeed, the Ninth Circuit has subsequently reaffirmed Mancusi as the "seminal case" addressing privacy in the workplace, and found, both before and after Ortega, that other employees' access to a defendant employee's personal office does not defeat the employee's reasonable

expectation of privacy in the office.  See Zeigler, 474 F.3d at 1190;
Taketa, 923 F.2d at 665; United States v. Lefkowitz, 464 F. Supp. 277,
231 (C.D. Cal. 1979), aff'd, 618 F.2d 1313 (9th Cir. 1980).

As the facts illustrate, Solano possessed keys to both the
manager's office and the security office, and used both offices to the
exclusion of all but a small number of other employees.  As prior
holdings make clear, the fact that these offices may have been shared
with a small number of employees and been accessible to superiors does
not defeat Solano's claim of standing under the Fourth Amendment.
Hence, the Court concludes that Solano had a reasonable expectation of
privacy in the records kept in both the manager's office and the
security office.[6]

The Government asserts that, even if the Court finds that Solano
had a reasonable expectation of privacy in the offices, he had no
expectation of privacy in the particular items seized.  The Government
notes that the items seized were company property and not Solano's
personal property.  (Further Opp'n, at 16.)

---

[6]   The Government disputes Solano's relationship to the
security office at the Alvarado store, noting that some of the
equipment in the office was not in use at the time of the search.
(Further Opp'n, at 14 n.3.)  Whether the equipment in the office
was in use at the time of the search is not, however, of primary
importance.  What is of concern to the Court is whether Mr.
Solano was personally using the office at the time of the search
in such a way as to have a reasonable expectation of privacy in
its contents.  Mr. Solano has declared that he regularly checked
the equipment in the office and, more importantly, stored files
there, indicating he regularly used the security office in
executing his duties and as a storage space for documents
relating to his duties.  While Officer Kading asserts that he was
told that another employee at one time used the office, it is
unclear how long ago this was, and, in any case, is not
especially probative in light of the holding in Mancusi, 392 U.S.
at 369.

A defendant's relationship to the items seized certainly may be a relevant factor in determining standing.  See United States v. Mancini, 8 F.3d 104, 108 (1st Cir. 1993); Williams v. Kunze, 806 F.2d 594, 599 (5th Cir. 1986); Taketa, 923 F.2d at 672.  Nonetheless, as the Ninth Circuit has made clear, "[a] person may have a privacy interest in his office, not just in his personal effects."  Taketa, 923 F.2d at 672; see also United States v. Issacs, 708 F.2d 1365, 1368 (9th Cir. 1983) ("The government's concession that the defendant had a legitimate expectation of privacy in the invaded place, precludes its contention that he had none in the items found there." (citations and quotations omitted)).  The Supreme Court and Ninth Circuit have consistently been willing to find that employees had a reasonable expectation in union, government, or corporate property kept in their personal offices.  See Mancusi, 392 U.S. at 369; Zeigler 474 F.3d at 1190; Taketa, 923 F.2d at 672-73; United States v. Lefkowitz, 618 F.2d 1313, 1316 n.2 (9th Cir. 1980).  Therefore, the mere fact that the documents seized were company property, does not defeat Solano's claim of standing, where Solano had a reasonable expectation of privacy in the offices where the documents were found.

The Government also asserts that "the avowed purpose of the photographs and items seized was for defendants and other employees to work with the photographs to attempt to exclude the persons depicted in them from the supermarkets."  (Further Opp'n, at 16.)  Hence, the Government argues that "Defendants never intended for the photographs to remain private."  (Id. at 16-17.)  This argument is contradicted, however, by the fact that the pictures were kept in locked offices, accessible by only Solano, George Torres, and Joe Ramos.  (Aug. 7 Hr'g

Tr., at 23-24.)  The evidence indicates that the photos were intended to be available to only those employees tasked with security. Furthermore, the documents were not ordinary corporate records, but rather, unique materials made and used for the express purpose of security.  Solano played an important role in creating the materials and stored them in a filing cabinet in the security room.  See 6 WAYNE R. LAFAVE, SEARCH & SEIZURE § 11.3(d), at 184 (4th ed. 2004) (noting that in an otherwise close case, the defendant's relationship to the item seized may be significant).  Therefore, the Court rejects the Government's argument that the nature of the documents seized negatively affects Solano's standing to challenge the search.

### 2. Carlos Monterosso

Carlos Monterosso was an employee who worked exclusively at the Jefferson Store. (Monterosso Supp. Decl., at 1.)  Beginning in 1987, Monterosso was responsible for monitoring the closed circuit security cameras for the store.  (Id.)  Monterosso worked out of a security office, which consisted of two small rooms on the second floor of the Jefferson Store.  (Id.)  The office had a one-way mirror, which allowed Monterosso to observe the store operations, while at the same time shielding him from the view of others.  (Id.)  Since 2001, Monterosso worked in the same specific office, which contained a desk, stereo, filing cabinets, security cameras, and television monitors.  (Id.)  The security office door was kept locked at all times, even when Monterosso was working in the office.  (Id. at 2.)  Monterosso states that another employee at the Jefferson Store had a key to the security office, which

the employee could use for the limited purpose of retrieving a
duplicate set of keys in the event that a store manager locked himself
out.  (Id.)  Monterosso kept a few personal items in the office, and
was present in the office when it was searched.  (Id.)  Two employees
of the Numero Uno markets, Joe Ramos and Berta Huerta, were present at
the Jefferson Store on the day it was searched, and corroborate that
Monterosso was present when the office was searched.  (Joe Ramos Decl.,
at 1; Huerta Decl., at 1.)  Officer Kading, however, claims that the
security office was unlocked when it was searched and that Monterosso
was not present at the time of the search.  (Further Opp'n, Kading
Decl. at 9.)

In light of these facts, the Court finds that Monterosso had a
reasonable expectation of privacy in his office in the Jefferson Store.
As discussed more thoroughly above, "in the private employer context,
employees retain at least some expectation of privacy in their
offices."  Zeigler, 474 F.3d at 1189.  Here, the facts suggest that
Monterosso's expectation of privacy was even more reasonable than
Solano's given that Monterosso had worked exclusively in the Jefferson
Store security office for many years, and shared the office with only
one other person.  Monterosso was one of only a few people who had keys
to the office, he kept the door locked at all times, and even kept
personal items in the space.  Even if Monterosso had not been present
at the time of the search, as Officer Kading disputes, the Court finds
that Monterosso had a reasonable expectation of privacy in the security
office, and therefore, has standing to challenge the constitutionality
of the search.

### 3.  George Torres

The question of whether George Torres has standing to challenge the searches is a closer one because he had a more complex relationship to the many areas searched.

### a.  Facts

George Torres and his wife, Roberta Torres, are the founders of the Numero Uno supermarket chain.  (George Torres First Supp. Decl., at 2.)  The Jefferson Store was their first market, which they opened in 1985.  (<u>Id.</u>)  Since that time, although the corporate organizational structure has changed, George Torres has maintained an active role in the day-to-day management of the stores.

At the time of the search, the eight Numero Uno stores searched were owned by three different corporate entities.  The first corporation, Numero Uno Market, Inc., owned the Figueroa, Cypress, Alvarado, and Jefferson Stores.  (<u>Id.</u>)  George Torres and his wife Roberta, each held a 50% ownership interest in Numero Uno Market, Inc. (<u>Id.</u>)  The second corporation, V.C.G. Enterprises, Inc., owned only the Durfee Store.  (<u>Id.</u>)  Again, George and his wife Roberta each held a 50% ownership interest in V.C.G. Enterprises, Inc.  (<u>Id.</u>)  The third corporation, United Grocers, Inc., owned the Pacific, Vermont, and Avalon Stores.  (<u>Id.</u>)  At the time of the search, George's son, Steven Torres, held a 50% ownership interest in United Grocers, Inc., and George and Roberta held the other 50% ownership interest as a community property asset.  (<u>Id.</u>)

George Torres also had an interest in the real property on which many of the stores searched are located. (<u>Id.</u> at 2-3.) As of the date of the search, George and Roberta owned the real estate, on which the Figueroa, Alvarado, Durfee, Jefferson, and Pacific Stores sit. (<u>Id.</u> at 3.) United Grocers, Inc., owns the real estate on which the Avalon Store is situated. (<u>Id.</u>) George and Roberta leased the property on which the Vermont Store sits. (<u>Id.</u>) The land on which the Cypress Store is situated is owned in the name of Roberta Torres as a community property asset. (<u>Id.</u>)

As mentioned before, George Torres asserted heavy managerial control over each of the stores searched. George Torres states that he exercised "full control over access to the buildings as well as managerial control over each market's day-to-day operations." (<u>Id.</u>) George Torres claims that he was in charge of the operation of each store and made the decisions with regard hiring, inventory purchasing, vendor selections, capital improvements, and security measures. (<u>Id.</u>) He states that he worked 12-hour days so that he could visit each store on a daily basis. (George Torres Second Supp. Decl., at 1.) This was feasible, he contends, because each store was within twenty to forty-five minutes of every other store. (<u>Id.</u> at 2.)

With regard to the security rooms generally, George Torres states that when he visited each location, he "routinely" visited the "security areas." (<u>Id.</u> at 1.) George Torres asserts "he ordered access to each of the security rooms limited to a very few people." (<u>Id.</u> at 2.) He states that he "considered the security rooms and the records stored in each security location to be private." (<u>Id.</u>) He

also states that he was the person who changed the locks when an employee left the company.  (George Torres First Supp. Decl., at 4.)

At the hearing on August 7, 2008, it was revealed that the Numero Uno franchise employs between thirty and fifty security guards, some of whom may be rotated to different stores and/or offices.  (Aug. 7 Hr'g Tr., at 13.)  George Torres also indicated that there is a remote security system in the many stores, which allows George to monitor the cameras in all of the stores from the Numero Uno main office.  (Id. at 18.)

With regard to the Alvarado Store, George Torres states that he visited the store at least once per day, and sometimes twice.  (George Torres Third Supp. Decl., at 1-2.)  Specifically, with regard to the manager's office, he states that he has been "especially careful" to ensure its safety because it contains sensitive materials such as the safe and the store computer.  (Id. at 1.)  Thus, he only allowed Solano and Joe Ramos, the Numero Uno General Manager, to have keys to that office.  (Id.)  George's daily visits to the Alvarado store sometimes lasted longer than an hour.  (Id. at 2.)  George states that during "virtually all" of his visits to the Alvarado Store, he worked part of the time in the manager's office reviewing records and speaking to Solano.  (Id.)

On August 7, 2008, George Torres gave specific testimony regarding his relationship to the Alvarado Store manager's office and the Court finds him to be generally credible.  He reiterated many of the facts stated in his previous declarations, such as the fact that he visited the Alvarado Store sometimes twice per day.  (Aug. 7 Hr'g Tr., at 16.) He also confirmed that no one was ever in the manager's office without

him, Solano, or Joe Ramos present.  (Id. at 27.)  George Torres stated that "every day" he and Solano met privately in the manager's office with the door closed in order to discuss sensitive business matters, such as the amount of cash receipts on hand.  (Id. at 31.)

When asked during the hearing about his relationship with the security office in the Alvarado store, George Torres said that he visited the security office on the second floor, "[f]rom time to time." (Id. at 32.)  Furthermore, George denied ever looking at the pictures of the shoplifters or other records when he visited the security office.  (Id.)

Officer Kading, via his declarations, attempts to call into question George Torres's relationship with the areas searched by stating that George Torres maintained his own corporate office at 700 East Jefferson Street.  (Further Opp'n, Kading Decl., at 6.)  Officer Kading notes that George Torres retained a general manger, Joe Ramos, and various individual store managers to oversee the stores' operations.  (Id.)  Officer Kading also states that Numero Uno employed over 600 people.  (Id. at 7.)  Although informative, these statements do not contradict George Torres's assertions of managerial control over the daily operation of the Numero Uno markets searched.  Notably, the Government's prior filed Statement of Facts states that George Torres "exercised control over all aspects of the Numero Uno supermarkets, including . . . the training and management of security guards, and the

1  review of payroll decisions by payroll managers."[7]  (Statement of Facts,

2  at 2.)

3      Officer Kading does, however, assert that he was told by the

4  seizing agents that the security room in the Vermont Store was

5  unlocked, and that the security equipment in some of the rooms was off

6  when they were searched.  (See Kading Decl. in Further Opp'n, at 5.)

7

8          b.  Analysis

9

10     George Torres claims an expectation of privacy based in part on

11  the fact that he was an owner of the stores searched.  As a general

12  matter, "an owner or operator of a business . . . has an expectation of

13  privacy in commercial property, which society is prepared to consider

14  to be reasonable."  New York v. Burger, 482 U.S. 691, 699 (1987).  The

15  Supreme Court has noted that this expectation of privacy in one's

16  business "is different from, and indeed less than, a similar

17  expectation in an individual's home."  Id.; see also Minnesota v.

18  Carter, 525 U.S. 83, 90 (1998).  This lessening of the expectation of

19  privacy in one's business is most relevant, however, with regard to

20  "commercial property engaged in 'closely regulated' industries."[8]

21

22  [7]    The Court recognizes that the Ninth Circuit has held that
    "[a] defendant is not entitled to rely on the government's
23  allegations in the pleadings, or positions the government has
    taken in the case, to establish standing," since "[t]he
24  government's assertions in its pleadings are not evidence."
    United States v. Zermeno, 66 F.3d 1058, 1062 (9th Cir. 1995);
25  see also United States v. Singleton, 987 F.2d 1444, 1450 (9th
    Cir. 1993).  However, in this case, the declaration of George
26  Torres largely confirms the Government's pleadings with regard to
    George Torres's extensive control over the stores.
27  [8]    The Government tries to argue that the supermarkets are a
    closely regulated industry.  (Further Opp'n, at 16 n.5.)
28

20

1  *Burger*, 482 U.S. at 700; see also United States v. Leary, 846 F.2d 592,

2  597 n.6 (10th Cir. 1988).

3      In Minnesota v. Carter, the Supreme Court found that the

4  defendants who engaged in a transaction in another person's home had no

5  reasonable expectation of privacy due to the purely commercial nature

6  of the transaction.  525 U.S. 83, 90-91 (1998).  However, the Court

7  also noted that the defendants lacked a long-term presence or previous

8  connection to the home.  Id.  Hence, it was clear that the defendants'

9  expectation of privacy was quite weak in any case.

10     Similarly, in United States v. Sarkisian, the Ninth Circuit found

11  that two defendants did not have a reasonable expectation of privacy in

12  a storage locker, relying in part on the lessened expectation of

13  privacy in commercial property, but also based on the fact that the

14  defendants could not show that they ever used the locker or had any

15  interest in any of the items seized.  197 F.3d 966, 987 (9th Cir.

16  1999); see also United States v. Paopao, 469 F.3d 760, 764-65 (9th Cir.

17  2006) (finding defendant lacked standing to challenge search of illegal

18  gambling room defendant did not own and was only present in for

19  commercial or illegal activity); United States v. Silva, 247 F.3d 1051,

20  1056 (9th Cir. 2001) (finding defendants had no standing to challenge

21  search of shed they were only present in for a few hours for the

22  commercial purpose of manufacturing drugs).

23     Hence, the commercial nature of the property at issue must

24  certainly be a factor in the Court's standing analysis, but it cannot

25  _____

26  However, the Government has not provided a single case holding as
    much.  Rather, the cases involving closely regulated industries
    are typically in the financial industry where there is a
27  comprehensive scheme of regulation.  See, e.g., United States v.
    Chuang, 897 F.2d 646, 650 (2d Cir. 1990).

28

be viewed as dispositive with regard to George Torres's legitimate expectation of privacy in the areas searched.  See United States v. Gamez-Orduno, 235 F.3d 453, 459-60 (9th Cir. 2000) (viewing the commercial nature of the activity in Carter as a crucial factor in determining standing).  Indeed, no one factor is dispositive, but rather, standing "must be addressed on a case-by-case basis." O'Connor v. Ortega, 480 U.S. 709, 718 (1987).

Whether George Torres has a reasonable expectation of privacy is complicated somewhat by the fact that he is not a sole proprietor, but a shareholder in the corporations that own the individual stores.  In such a case, even if the defendant is a corporate officer, that person may not simply "vicariously take on the privilege of the corporation under the Fourth Amendment." United States v. Britt, 508 F.2d 1052 (1st Cir. 1975); see also Lefkowitz, 618 F.2d at 1316 (finding that defendant "does not have standing merely because he was a corporate officer" in corporate suite); Lagow v. United States, 159 F.2d 245, 246 (2d Cir. 1947); In re 14 East Seventeenth St., 65 F.2d 289, 290 (2d Cir. 1933).  Hence, George Torres cannot rely only on his substantial ownership interests in the corporations that own the Numero Uno stores. This is a necessary consequence of "a man choos[ing] to avail himself of doing business as a corporation, even [as] sole shareholder." Britt, 508 F.2d at 1052.  Nonetheless, George Torres's substantial ownership interest in the corporations owning the supermarkets can be a supportive factor in finding that he may possess a reasonable expectation of privacy in their premises.  See Gonzalez, 412 F.3d at 1106; United States v. Chuang, 897 F.2d 646, 650 (2d Cir. 1990); United States v. Brien, 617 F.2d 299, 306 (1st Cir. 1980); United States v.

Moscatiello, 771 F.2d 589, 601 (1st Cir. 1985), vacated on other grounds sub nom. Carter v. United States, 476 U.S. 1138 (1986); Henzel v. United States, 296 F.2d 650, 653 (5th Cir. 1961); United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981); United States v. SDI Future Health, Inc., 491 F. Supp. 2d 975, 977-78 (D. Nev. 2007).

In order to have standing, however, George Torres must provide additional evidence of a relationship to the areas searched. Courts have been willing to find that an employee had a reasonable expectation of privacy in areas apart from a personal office as long as the employee's responsibilities had a sufficient connection or nexus with the areas searched. See Gonzalez, 412 F.3d at 1106 (finding that corporate officers had reasonable expectation of privacy in corporate office owned by them and where their offices were located); United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (giving defendant a standing in a warehouse even though he "maintained his principal place of business in another warehouse"); United States v. Anderson, 154 F.3d 1225, 1230 (10th Cir. 1998); Mancini, 8 F.3d at 110; United States v. Brien, 617 F.2d 299, 306 (1st Cir. 1980); United States v. SDI Future Health, Inc., 491 F. Supp. 2d 975, 977-78 (D. Nev. 2007); United States v. Lefkowitz, 464 F. Supp. 277, 231 (C.D. Cal. 1979), aff'd, Lefkowitz, 618 F.2d at 1316 n.2 (finding that corporate officers had reasonable expectation of privacy in entire corporate suite in which personal offices were located).

In Chuang, the Second Circuit considered whether the defendant, the chairman and president of the company, had standing to object to the search and seizure of corporate documents from a bank. 897 F.2d at 650. The court noted that "[i]t is well-settled that a corporate

officer or employee in certain circumstances may assert a reasonable
expectation of privacy in his corporate office, and may have standing
with respect to searches of corporate premises and records." Id. at
649.  The inquiry, the Second Circuit noted, "focuses principally on
whether he has made a sufficient showing of a possessory or proprietary
interest in the area searched." Id. The defendant "must demonstrate a
sufficient nexus between the area searched and his own work space."
Id.  This, the court said, was to be determined on a case-by-case
basis. Id. at 650.

Applying the standard articulated, the Second Circuit found that
the defendant did not have a reasonable expectation of privacy because
a bulk of the documents were found on the fourth floor, not the third
floor where his office was located, and the defendant had failed to
demonstrate a "sufficient nexus" with the areas searched. Id.
Moreover, the court noted that the "expectation of privacy is
particularly attenuated in commercial property employed in closely
regulated industries." Id.  Thus, "[i]n view of the pervasive nature
of federal regulation of the banking industry, Chuang, as an officer of
the bank, knew that bank documents, whether kept in his office or
another office, were subject to periodic examination by the [Office of
the Comptroller of the Currency]." Id.

In light of these principles, the Court finds that George Torres
has met his burden of demonstrating a reasonable expectation of privacy
in the manager's office of the Alvarado Store, but not any of the other
areas searched.  The evidence presented by George Torres shows that
there was a sufficient nexus between his day-to-day duties as the
manager of the company and the manager's office of the Alvarado Store.

George Torres visited the store at least once per day, sometimes more, and presented evidence that he regularly worked in the manager's office when there.  George Torres was in charge of the purchasing, hiring, and vendor decisions at the store.  Moreover, he and the store manager Solano, met in private in the manager's office every single day to discuss sensitive business matters.  George Torres founded the Numero Uno markets, and for over twenty years he worked with the same hands-on managerial style, thereby spending significant time in the manager's office of the Alvarado Store.

George Torres's specific efforts to maintain the privacy of the Alvarado Store manager's office substantially bolsters his claim to a reasonable expectation of privacy.  See Zeigler, 474 F.3d at 1190; United States v. Mancini, 8 F.3d 104, 110 (1st Cir. 1993); Anderson, 154 F.3d 1225 at 1232; SDI Future Health, 491 F. Supp. at 977-78.  The manager's office contained important materials such as the safe, cash receipts, and the company computer.  As a result, George Torres took measures to tightly control access to the office.  He gave only himself, Solano, and Joe Ramos keys to the office, and never let anyone else in the office without one of them present.  Furthermore, George Torres was the one person in charge of changing the locks on the doors when employees left employment.[9]

---

[9]   George Torres also attempts to bolster his claim of standing by asserting he was the central target of the search at issue, which some courts have found to be a potentially significant factor in a finding of standing.  See, e.g., Britt, 508 F.2d at 1055.  (Supp. Mot., at 10.)  However, the Supreme Court has specifically rejected the notion that a defendant may assert standing on the basis that the defendant was the target of the search.  See Rakas v. Illinois, 439 U.S. 128, 133-38 (1978).  The Court, therefore, does not take this factor into account in its determination.

George Torres's relationship to the manager's office in the Alvarado Store is analogous in many respects to that of the defendants to office building in <u>Gonzalez</u>, 412 F.3d 1102. There, the Ninth Circuit found that two corporate officers in a public bus company had a reasonable expectation of privacy in the company's corporate headquarters. <u>Id.</u> at 1116. The court found that the defendants had a reasonable expectation of privacy in the building because the company was "a small, family-run business housing only 25 employees at its peak," and the defendants "were corporate officers and directors who not only had ownership of the [building] but also exercised full access to the building as well as managerial control over its day-to-day operations." <u>Id.</u> at 1116-17. The court specifically did not rule out, however, "the possibility that the hands-off executives of a major corporate conglomerate might lack standing to challenge all intercepted conversations at a commercial property that they owned, but rarely visited."[10] <u>Id.</u> at 1117.

Here, like the defendants in <u>Gonzalez</u>, George Torres exercised full access to the Alvarado Store manager's office and exercised complete control over the Store's day-to-day operations. Although the Numero Uno supermarket chain employs more than 600 people total, there were obviously fewer working at the Alvarado Store. Furthermore, George Torres has been intimately involved in the operation of the

---

[10]   The Government contests the applicability of <u>Gonzalez</u> case because it is a wiretap case. However, for the purposes of this Motion, the Court finds it relevant because, as the Ninth Circuit noted, even in the wiretap context, the "touchstone for Fourth Amendment standing analysis is whether the individual asserting her right to challenge the interception had a reasonable expectation of privacy." <u>Id.</u> at 1116 (citing <u>Ortega</u>, 480 U.S. at 711-12).

Numero Uno markets since day one, and has taken strenuous efforts to maintain his involvement in all aspects of each store.  As a result, he could hardly be considered a hands-off executive of a "major corporate conglomerate."  Rather, George Torres ran the company much like a closely-held corporation, managing each aspect of the Alvarado Store's operations.

Furthermore, the documents seized from the Alvarado Store manager's office were not ordinary corporate documents, but unique materials relating to the security of the stores.  George Torres played an integral role in developing the security apparatus at each of the stores, as security was crucial to the company's success.  See 6 LaFave, Search & Seizure § 11.3(d), at 184 (noting that in a close case it may be significant that the defendant played a unique role in the preparing the items seized).

The Government makes much of the fact that George Torres maintained an office for his personal use at the Numero Uno headquarters.  The Government argues that this fact shows that Plaintiff did not have a reasonable expectation in any of the places searched.  (Further Opp'n, at 11.)  The fact that George Torres had a separate office elsewhere, however, does not necessarily preclude him from establishing a separate expectation of privacy in the areas searched.  Indeed, "the Fourth Amendment protects the reasonable expectation of privacy [a person] has in multiple places."  Chaves, 169 F.3d at 691.

Finally, a review of the relevant case law reveals that George Torres's connection to the Alvarado Store manager's office was substantially closer than those cases where standing has been rejected

for corporate officers and employees.  See, e.g., United States v. Mohney, 949 F.2d 1397, 1404 (6th Cir. 1991) (finding defendant had no "reasonable expectation of privacy in documents he claimed to be completely uninvolved in preparing and which were kept in offices he claimed to rarely visit"); Chuang, 897 F.2d at 650 (finding no reasonable expectation of privacy for bank officer because closely regulated industry and documents seized from other employee's office); United States v. Wright, 826 F.2d 938, 944 (10th Cir. 1987) (finding defendants had no standing in corporate offices because had "no right to control or exclude the use by others of the property or the premises."); Martinez v. Nygaard, 831 F.2d 822, 826 (9th Cir. 1987) (finding no reasonable expectation of privacy because factory employees "had no private space in any part of the building, and no authority to exclude others" as well as "no possessory interest in the place searched or things seized"); United States v. Battista, 646 F.2d 237, 243 (6th Cir. 1981) (corporate officer had no standing to challenge search of abandoned box containing corporate property); United States v. Bush, 582 F.2d 1016, 1018-19 (5th Cir. 1978) (finding corporate officer had no reasonable expectation of privacy in corporate warehouse where he did not work); United States v. Cella, 568 F.2d 1266, 1283 (9th Cir. 1977) (corporate officer lacked reasonable expectation of privacy in print shop because lacked "an independent possessory or propriety interest" in the documents kept at the shop and had not spent a "considerable amount of time" at the shop or demonstrated that he owned and operated it); Britt, 508 F.2d at 1055 (finding corporate officer had no reasonable expectation of privacy in corporate storage area where he never spent any time); United States v. Cohen, 516 F.2d

1358, 1366 (8th Cir. 1975) (finding corporate officer had no standing to challenge search of garage area in building housing corporate offices because "search was not directed against him, his residence, or even his office"); United States v. Smallwood, 443 F.2d 535, 539 (5th Cir. 1971) (corporate officer had no standing to challenge seizure of corporate records seized pursuant to subpoena after receiver appointed by court to take control of corporate premises); Galbraith v. United States, 387 F.2d 617, 618-19 (10th Cir. 1968) (corporate officer had no standing to challenge seizure of corporate records by subpoena from independent bank); United States v. H.J.K. Theatre Corp., 236 F.2d 502, 505 (2d Cir. 1956) (corporate officer lacked standing to challenge seizure of corporate records voluntarily turned over to government by other corporate officer); United States v. Judd, 687 F. Supp. 1052, 1056 (N.D. Miss. 1988) aff'd, 889 F.2d 1410, 1413 (5th Cir. 1989) (finding corporate officers, one a sole shareholder, had no reasonable expectation of privacy in bookkeeping office because defendants did not work out of it except "occasionally").

Thus, the Court finds that by virtue of his significant ownership interest, personal managerial responsibilities at the Alvarado store, and substantial and consistent time spent personally working in the manager's office, George Torres had a reasonable expectation of privacy in its contents.

By contrast, the Court finds that, at this time, George Torres has not met his burden of establishing a legitimate expectation of privacy in the Alvarado Store security office, or any other office of the other stores searched. With regard to the security offices generally, George Torres has only come forward with generalized assertions that he

"routinely" visited the security offices and that he directed that they be kept private.  However, when asked at the hearing about the security office in the Alvarado Store, the most he could muster is that he visited the security room "from time to time."  George Torres also indicated at the hearing that the company contracts out its security work with 30 to 50 security guards who provide security for the stores. This fact calls into question his claim that he kept the offices secure and only directed access to a small number of individuals. Furthermore, George Torres testified that the company has a remote security system, which allows him to monitor the activities of the security cameras without visiting the individual stores.  This suggests that he did not spend much personal time in the security offices, but rather monitored the stores remotely.  George Torres did not keep any personal items in any of the locations, nor was he present when any of them were searched.  In short, at this time there is no convincing evidence, like that presented in the case of the manager's office of the Alvarado Store, of a substantial nexus to the places searched.

        Part of the difficulty on this issue arises from the fact that the record is not entirely clear regarding George Torres' relationship to the other areas searched.  It is, of course, the Defendants' burden to present the Court with such evidence and to explain exactly what George Torres' relationship was to the areas searched.  To this point, the Court has given Defendants ample opportunity, yet Defendants have fallen short of meeting their burden.  For example, at the hearing held on August 7, 2008, the issues of the security guards and the remote monitoring of the cameras came up, and Defendants had an opportunity to address the issues on redirect, yet failed to do so.  At this time,

therefore, the Court is disinclined to find that George Torres has standing in any of the locations searched other than in the manager's office of the Alvarado Store.  However, the Court will not make a final determination on this issue until after the Court holds the <u>Franks</u> hearing, at which time Defendants will have an opportunity to comment further on the record.

In sum, the Court finds that George Torres has met his burden of establishing a reasonable expectation of privacy in the Alvarado Store manager's office, and therefore, has standing to challenge the search of that location.  The Court will reserve ruling on George Torres's standing with regard to the other locations until after the <u>Franks</u> hearing.

**B.  Probable Cause**

We now turn to whether the Affidavit established probable cause for issuance of the Warrant.  In order to issue a warrant, a magistrate judge is required to determine the "commonsense, practical question whether there is a 'probable cause' to believe that contraband or evidence is located in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 230 (1983).  To establish probable cause, the Government must demonstrate that there is more than a fair probability that contraband or evidence is located in a particular place. <u>Id.</u> at 246; <u>United States v. Gourde</u>, 440 F.3d 1065, 1069 (9th Cir. 2005).  This is not a standard of certainty or preponderance of the evidence. <u>United States v. Kelley</u>, 482 F.3d 1047, 1050-51 (9th Cir. 2007).  Rather, probable cause is a "fluid concept, turning on the assessment of probabilities

in particular factual contexts, not readily or even usefully, reduced to a neat set of legal rules." <u>Gates</u>, 426 U.S. at 232.  Whether probable cause exists must be determined by an analysis of the "totality of the circumstances."  <u>Id.</u> at 230.

Where a magistrate judge has previously determined probable cause, that determination should be "paid great deference by reviewing courts."  <u>Id.</u> at 236.  In reviewing the issuance of a warrant by a magistrate, a court will uphold such issuance where there is a "substantial basis for concluding that a search would uncover evidence of wrongdoing."  <u>Id.</u> (quotations omitted). "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  <u>Id.</u> at 237 n.10 (quotations omitted).  When reviewing a magistrate's determination of probable cause, courts are limited to the information contained within the four corners of the affidavit supporting the application for the search warrant.  <u>United States v. Huguez-Ibarra</u>, 954 F.2d 546, 552 (9th Cir. 1992).

The Court finds that there was no probable cause for the vast majority of the searches authorized by the Warrant.  The only fact that could give rise to probable cause for a search was the conversation that Officer Kading heard on the wiretap, in which it was indicated that there had been an incident at the Vermont Store, where a suspected shoplifter had been detained for several hours.  The Affidavit specifically quotes Garcia as stating that Leidelmeyer "went in there and showed his PD badge and shook the guy up a little bit."  Looking only at the face of the Affidavit, as the Court must, this is the only

illegal conduct related in the Affidavit and the only conduct that could have provided probable cause for a search.[11]  The Court notes that this isolated statement is ambiguous; it is not exactly clear whether Garcia is saying that the act of showing the shoplifter the badge "shook the guy up a little bit," or whether Leidelmeyer "shook the guy up a little bit," meaning that he used physical force on the shoplifter.  Given the deferential standard of review of a magistrate's finding of probable cause, however, the Court finds that the latter interpretation, that Leidelmeyer used physical force, is a plausible interpretation of the statement.[12]  See United States v. Nielsen, 371 F.3d 574, 579 (9th Cir. 2004) (noting that magistrate's finding of

---

[11]    Under California law, it is a misdemeanor for a "person pretending to be a public officer . . . under the pretense or color of any process or other legal authority" to "[a]rrest[] any person or detain[] that person against his or her will."  Cal. Penal Code § 146.  Furthermore, it is a misdemeanor to willfully use a police badge or object resembling a peace badge "with the intent of fraudulently impersonating a peace officer, or of fraudulently inducing the belief that he or she is a peace officer."  Id. § 538(a).  Defendants argue that since these violations are only misdemeanors, the evidence should be suppressed, because California only allows a warrant to issue "when the property or things to be seized consist of any item or constitute any evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony."  Id. § 1524(a)(4).

    The Court finds, however, that probable cause existed to believe that a felony occurred in the use of unreasonable force in the detention of the one shoplifter at the Vermont Store that the police heard on the wiretap.  See id. § 237 ("If the false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment in the state prison."); People v. Wardell, 162 Cal. App. 4th 1484, 1490 (Ct. App. 2008) (noting that felony false imprisonment can be found when there is evidence of menace, meaning "a threat of harm express or implied by word or act").

[12]    The accuracy of this quoted statement is addressed infra Part III.C.2, in connection with the finding that a Franks hearing is necessary.

probable cause is reviewed for clear error).  Moreover, the magistrate's job is to make a common-sense interpretation of the information in the Affidavit, which in this case, could have been that violence was used.  <u>See</u> <u>United States v. Hay</u>, 231 F.3d 630, 634 n.4 (9th Cir. 2000).  As a result, there was probable cause to search only the Vermont Store for a photograph of the individual that the police suspected had been detained, and for the police badge allegedly used in that detention.

There was not, however, probable cause for any other aspect of the search.  There was no probable cause to search any of the seven other stores.  "A search warrant designating more than one person or place to be searched must contain sufficient probable cause to justify the issuance as to each person or place named therein."  <u>Greenstreet v. County of San Bernardino</u>, 41 F.3d 1306, 1309 (9th Cir. 1994).  In fact, "in the case of multi-location search warrants, the magistrate must be careful to evaluate each location separately."  <u>Id.</u>  Here, the one incident in the Vermont Store did not give the police probable cause to search the seven other stores, and there are no other facts in the Affidavit that could otherwise provide probable cause.

The Government argues that probable cause existed to search the other stores because of an alleged "policy" of unlawfully detaining shoplifters.  (Opp'n, at 22.)  In the Affidavit, Officer Kading states that he asked Manuel Torres what the "company policy" was regarding shoplifters.  Manuel Torres allegedly told him that they were "selective in notifying/summoning law enforcement," that they were commonly detained for approximately one hour in the back of the store, and then released.  This statement cannot form the basis for probable

cause because there is no indication that such a policy would be illegal, given that California law expressly allows store owners to detain suspected shoplifters.

Under California law, false imprisonment is defined as "the unlawful violation of the personal liberty of another." Cal. Penal Code § 236. "If the false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment in the state prison." Id. § 237.

However, "[m]erchants have traditionally had the right to restrain and detain shoplifters," without being subject to prosecution for false imprisonment. People v. Zelinski, 24 Cal. 3d 357, 362 (1979). This privilege has been codified in the California Penal Code, which states: "A merchant may detain a person for a reasonable time for the purpose of conducting an investigation in a reasonable manner whenever the merchant has probable cause to believe the person to be detained is attempting to unlawfully take or has unlawfully taken merchandise from the merchant's premises." Cal. Penal Code § 490.5(f)(1). Furthermore, "in making the detention a merchant . . . may use a reasonable amount of nondeadly force necessary to protect himself or herself and to prevent escape of the person detained or the loss of tangible or intangible property." Id. § 490.5(f)(2).

Given California law regarding false imprisonment and the shopkeeper's privilege, there was no probable cause to believe that a company policy of detaining shoplifters for one hour and then releasing them was illegal. The Government argues that the police had probable cause to believe that the policy was illegal due to the fact that Officer Kading states in the Affidavit that in some of the pictures of

the shoplifters they had "red watery eyes," and Manuel Torres admitted that mace had been used on some of the detained shoplifters. (Opp'n, at 19.)  First, the fact that some of shoplifters had "red watery eyes," does not lead to the reasonable inference that they were sprayed with mace.  Second, even if mace had been used, California law expressly allows merchants to use the "amount of nondeadly force necessary" in detaining a suspected shoplifter.  See Cal. Penal Code § 490.5(f)(2).  There are no facts in the Affidavit that would lead the magistrate to conclude that the use of mace was not necessary for self-defense or to prevent escape.  See id.  Nor is there any indication in the Affidavit that the mace was ever used in any of the other stores.

The only other statement in the Affidavit that suggests a company-wide policy of illegal detention, is the statement that Officer Kading asked Rory Leidelmeyer about the "stores [sic] policy" regarding documentation of detained shoplifters.  Leidelmeyer allegedly told Kading that they "typically" took a Polaroid picture and then released the shoplifter after one or two hours.  Leidelmeyer also allegedly stated that the Figueroa Store took pictures in the same manner.  Again, these statements cannot form the basis for probable cause to believe that the Numero Uno markets had a company-wide policy of illegally detaining suspected shoplifters for a couple reasons.

First, the information in the Affidavit is ambiguous because Officer Kading allegedly asked Leidelmeyer about the "stores [sic] policy."  Obviously, there is a missing apostrophe in this statement, which would make it either singular (the "store's policy") or plural (the "stores' policy").  Nonetheless, when viewed in the context of the surrounding statements in the Affidavit, it is clear that the reference

1   to a policy, was not a company-wide policy, but rather only a Vermont
2   Store policy.  This is evident from the fact that in the very next
3   sentence, the Affidavit relates that Leidelmeyer said that the Figueroa
4   Store "also retains photographs in the same manner."  Thus, the
5   preceding sentence stating how they took a picture and released the
6   shoplifter after one or two hours was only in reference to the Vermont
7   Store.  At most, this statement could form the basis for believing that
8   a two-store policy existed of taking pictures.

9       Second, there is no reason to believe that a policy of taking a
10  picture and then releasing the suspect after one or two hours was
11  illegal.  The Government advances no argument why taking a picture of a
12  suspected shoplifter is illegal.  Furthermore, as discussed above,
13  California law allows merchants to detain shoplifters for a reasonable
14  time in a reasonable manner.  There are no facts in the Affidavit that
15  could lead a magistrate to conclude that one or two hours was
16  unreasonable, so as to vitiate the shopkeeper's privilege, or that
17  there was any menace involved that could form the basis of felonious
18  false imprisonment.

19      Thus, the Affidavit does not provide probable cause for any of the
20  searches of the seven stores other than the Vermont Store.  In short,
21  there was no evidence of a company-wide policy of illegally detaining
22  shoplifters, given that California law expressly allows merchants to
23  detain shoplifters and to use nondeadly force under certain
24  circumstances.

25      There was also no probable cause to seize written documentation,
26  other than the photograph, at the Vermont Store.  The incident
27  overheard on the wiretap gave the police probable cause to search and
28

1   seize only a picture of the detained shoplifter and the police badge.
2   It did not provide probable cause to seize any other written documents.
3   Officer Kading makes no mention in the Affidavit that he had reason to
4   seize other written documents.  In fact, he requests only permission to
5   "seize the aforementioned photographic evidence that would allow law
6   enforcement to identify persons believed to be victims of the
7   aforementioned crimes."   Nonetheless, the Warrant gave the police
8   permission to seize "[a]ny written documentation, such as, but not
9   limited to, daily logs, related to the detention of individuals
10  occurring at the Numero Uno Markets."  Thus, the Court finds that there
11  was no probable cause to seize written documentation from the Vermont
12  Store.  See United States v. Kow, 58 F.3d 423, 427 (9th Cir. 1995)
13  (finding that the affidavit did not establish probable cause to seize
14  documents because the information in the affidavit related to acts of
15  violence with no apparent connection to the business documents); United
16  States v. Weber, 923 F.2d 1338, 1343 (9th Cir. 1991) (finding a warrant
17  invalid "because it seeks items as to which there is no probable
18  cause").

19      The Government contends that Officer Kading's belief that Manuel
20  Torres and Leidelmeyer were being evasive at certain times during their
21  interviews supports a finding of probable cause.  (Opp'n, at 22-23.)
22  The Court rejects this argument.  The fact that they may have been
23  evasive did not create a substantial basis to conclude that there was
24  any specifically written documentation regarding shoplifter detentions
25  at the Vermont store that was not being disclosed.  For probable cause
26  to exist, Officer Kading needed to have provided specific testimony or
27  pointed to specific facts indicating such documentation existed and
28

would be found at the Vermont Store.  <u>See</u> <u>Kow</u>, 58 F.3d at 427 (noting that the warrant did not explain how the documents related to specific criminal activity).  Lacking this, the Affidavit provided no basis to conclude that such documentation would be found.  As a result, the Court finds that there was no probable cause to issue a warrant for seizure of written documentation at the Vermont Store.

The remaining evidence appearing in the Affidavit is no more probative. None of the facts stated in the Affidavit indicated that the detentions of shoplifters were in violation of California law.  Hence, the Court concludes that, when limiting its inquiry to the face of the Affidavit, the information in the Affidavit provides no probable cause for the search of any of the stores for evidence of illegal detentions beyond the single incident overheard on the wiretap.[13]

///

///

///

///

---

[13]  Defendants argue that the Affidavit could not support search of the non-Vermont Avenue Numero Uno stores because it nowhere specifically requested authority to search them.  Instead, at the close of the Affidavit, Officer Kading merely requested a warrant to search the stores "listed above." (Mot., Ex. A., at 41.)  No such list of the Numero Uno stores appears in the Affidavit.  In a subsequent declaration, Officer Kading asserts that the list of stores appeared in the search warrant itself, which was attached on top of the supporting Affidavit. (Kading Second Supp. Decl. at 1.)  Officer Kading further asserts that the warrant indicated that it incorporated the Affidavit, and the "listed above" reference in the Affidavit referred to the list of stores appearing in the search warrant. (<u>Id.</u> at 1-2.)  Whether the Court accepts this explanation or not, and whether or not such reference is legally sufficient, is immaterial, as the Affidavit fails to provide any evidence supporting probable cause to search the non-Vermont Avenue stores.

### C.  Good Faith Exception

Evidence seized pursuant to a facially valid search warrant, which is later held to be invalid, may nevertheless be admissible if officers conducting the search acted in good faith and in reasonable reliance on the warrant.  United States v. Leon, 468 U.S. 897, 926 (1984).  "The government bears the burden of proving that reliance upon the warrant was objectively reasonable."  United States v. Kow, 58 F.3d 423, 428 (9th Cir. 1995).

The Supreme Court has identified, however, at least four situations in which reliance on a warrant cannot be considered objectively reasonable, and therefore, the good faith exception does not apply: (1) when the affiant knowingly or recklessly misleads the judge with false information, (2) when the judge wholly abandons his or her neutral role, (3) when the affidavit is so lacking in indicia of probable cause that official belief in its existence is objectively unreasonable, and (4) when the warrant is so facially deficient that executing officers cannot reasonably presume it to be valid (i.e., it fails to specify the place to be searched or the things to be seized).  United States v. Luong, 470 F.3d 898, 902 (9th Cir. 2006) (citing Leon, 468 U.S. at 914).  The Court finds that two exceptions to the good faith exception likely apply here.

### 1.  Insufficient Affidavit

The good faith exception does not apply when the affidavit is so lacking in indicia of probable cause that official belief in its

existence is objectively unreasonable.  <u>Luong</u>, 470 F.3d at 902.  "[T]he officer's affidavit must establish at least a colorable argument for probable cause."  <u>Id.</u>  When conducting the inquiry, the court should consider "whether the affidavit is 'sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause.'"  <u>Id.</u> (quoting <u>Leon</u>, 468 U.S. at 926).

Here, the Court finds that the Affidavit was so lacking in probable cause for the searches of the other seven stores, so as to make it unreasonable to believe that probable cause was present for the searches.  The only possible basis for the searches was the existence of a company-wide policy of felonious detentions of alleged shoplifters.  However, the Affidavit only indicates that there was a policy of detaining shoplifters for one to two hours and then releasing them, which is not illegal under California law.  <u>See</u> Cal. Penal Code § 490.5(f).  California law allows merchants to use the force necessary to detain shoplifters in certain circumstances, and there is no evidence in the Affidavit that any suspected force was for any purpose other than self-defense or to prevent the escape of a shoplifter.  <u>See id.</u> § 490.5(f)(2).  Thus, there is not even a colorable argument that there was an illegal company-wide policy of using felonious force in the detention of shoplifters.

Furthermore, there is no indicia of probable cause from the Affidavit that documentation regarding shoplifters would be found at the Vermont Store.  In fact, the Affidavit makes no mention of documentation, and does not even request permission to seize such material.

Thus, the Court is inclined to find that the good faith exception

does not apply because the Affidavit was so lacking in probable cause as to make reliance on it objectively unreasonable.   This finding alone could be sufficient to find that the good faith exception does not apply.   Out of an abundance of caution, however, the Court will consider the false statements made in the Affidavit.

### 2.   False Statements

The good faith exception does not apply when the affiant knowingly or recklessly misleads the magistrate with false information.   <u>Luong</u>, 470 F.3d at 902.   The Supreme Court has outlined the standard for asserting such a challenge:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.   In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

<u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978); <u>see also</u> <u>Belmontes v. Brown</u>, 414 F.3d 1094, 1122 (9th Cir. 2005); <u>United States v. Fernandez</u>,

388 F.3d 1199, 1238 (9th Cir. 2004); United States v. Celestine, 324

F.3d 1095, 1102 (9th Cir. 2003).  Here, a comparison of the Affidavit

and the transcripts of certain recorded conversations, reveals that

Officer Kading affirmatively misrepresented the nature of his

conversations with both Rory Leidelmeyer and Manuel Torres, thereby

misleading the magistrate to believe that probable cause existed to

search the seven other stores.  Thus, the Court finds that Defendants

have met their burden of making a substantial preliminary showing that

false statements were made intentionally or with reckless disregard for

the truth, and that those false statements were necessary to any

finding of probable cause.

First, the Affidavit states that Manuel Torres told Officer Kading

that there was a "company policy" of detaining shoplifters for one hour

in the back of the store and then releasing them.  The transcript of

this conversation, however, reveals that Manuel Torres never made any

mention of a company-wide detention policy.  (Corrected Tr. of Manuel

Torres Interview, at 17.)  Rather, Manuel Torres said that only

juveniles are detained for an hour or so.  (Id.)  By contrast, he

stated that adults are simply asked to pay for the items they have

stolen and then released, or the employees call the police.  (Id. at

4.)

Second, the Affidavit states that Leidelmeyer said that the

"stores [sic] policy" regarding shoplifters was to "typically" take a

picture of the suspects and then release them after one or two hours.

A review of the transcript from the recorded conversation, however,

reveals that Leidelmeyer never made any such statements.  (See Mot.,

Ex. E.)  Leidelmeyer never mentioned the store's "typical" policy, nor

did he state that shoplifters are detained for "one or two hours."
Indeed, Leidelmeyer makes no comment regarding the length of the
detentions.

Third, the Affidavit misquotes the conversation overheard on the
wiretap between George Torres and Alfredo Garcia.  The Affidavit quotes
Garcia as stating "[Leidelmeyer] went in there and showed his PD badge
and shook the guy up a little bit."  In actuality, however, the
transcript of the conversation reveals that Garcia's exact words were:
"[Leidelmeyer] went in there and he [U/I] a PD badge, so he shook him
up a little bit."  Although this is a slight difference, it is an
important difference, because it puts a different slant on an already
ambiguous statement.  The true statement, that Liedlemeyer showed the
shoplifter his police badge, "so he shook him up a little bit,"
suggests more strongly that there was no physical force used on the
shoplifter, but that it was the act of showing him the police badge
that had the effect of shaking up the shoplifter.  The Court can
conceive of no explanation for why Officer Kading could not have
accurately quoted Garcia on this statement given that he had access to
the transcript, and there does not appear to have been any rush in
preparing the Affidavit.  Accuracy in these quoted statements is
especially important in this context given that, under California law,
there is a fine line between the shopkeeper's privilege and felonious
false imprisonment.  Thus, by presenting inaccurate information to the
magistrate, Officer Kading deprived the magistrate of making a fully
informed decision on whether probable cause existed for the search.

Finally, the Affidavit omits information that reveals how, on
numerous occasions, Numero Uno store employees in fact handled

shoplifters in a perfectly legal fashion.  The evidence shows that Officer Kading had intercepted over a hundred conversations and possessed numerous arrest reports indicating that Numero Uno employees had called the police following detention of a shoplifter.  (See Mot., Exs. K, L.)  If disclosed to the magistrate, this information would have seriously undercut the Affidavit's assertion that there was company-wide policy of illegal detention.

These false statements were all material to the finding of probable cause.  As discussed before, the existence of a company-wide policy of illegal detention was the only possible basis of probable cause for a search of the seven other stores.  Thus, if neither Manuel Torres or Leidelmeyer made any statements regarding such a company-wide policy,  there could be no probable cause for the searches.  In fact, the only basis for probable cause for the search of the Vermont Store was the intercepted conversation between Alfredo Garcia and George Torres, which indicated that Leidelmeyer had shown a police badge and violently assaulted the shoplifter.  However, it appears now that even that statement was not accurately quoted by Officer Kading, which, if made intentionally or with reckless disregard for the truth, could have the effect of negating all probable cause for any of the searches.

Thus, the Court finds that Defendants have met their burden of making a preliminary showing that there were false statements and that those statements were material to the finding of probable cause.  The Court will hold a _Franks_ hearing in order to determine whether the

false statements were in fact made intentionally or with reckless

disregard for the truth.[14]

**IV.  CONCLUSION**

With regard to standing, the Court finds that Solano had a

reasonable expectation of privacy in the manager's office and the

security office of the Alvarado Store.  Monterosso had a reasonable

---

[14]    Defendants also ask the Court to suppress evidence under the
supervisory powers doctrine in light of Officer Kading's
misrepresentations and omission in the Affidavit.  Defendants
rely on a Seventh Circuit case, United States v. Cortina, 630
F.2d 1207 (7th Cir. 1980).  In Cortina, an FBI agent deliberately
lied about information furnished to him by a confidential source
in preparing an affidavit for a warrant and nearly all of the
incriminating information furnished in the affidavit was shown to
be false.  Id. at 1209-10.  As the court found that "[t]he
judicial system itself ha[d] been defrauded," it excluded
evidence arising from the warrant under its supervisory powers
despite the lack of a clear showing of standing by the
defendants.  Id. at 1214.  The court stated: "Our standard is
plain: when the government lies to the magistrate in securing a
warrant to the extent that there is no probable cause for the
search, and when that search results in the seizure of evidence,
this Court will suppress the evidence."  Id. at 1217.
     As an initial matter, in United States v. Payner, decided
just a few months before Cortina, the Supreme Court cautioned
that courts should not use their supervisory powers to exclude
evidence "in every case of illegality."  447 U.S. 727, 737
(1980).  The Court noted that the remedy of excluding evidence
should be "weighed against the considerable harm" that could
result, including the toll the exclusionary rule places on the
"ability of courts to ascertain the truth in a criminal case."
Id.  As a result, the Ninth Circuit has never expressly accepted
the reasoning of the Seventh Circuit in Cortina, and in light of
Payner, has expressly not ruled on whether "the exclusionary rule
can ever apply absent some constitutional violation."  See United
States v. Harrington, 681 F.2d 612, 615 (9th Cir. 1982).  Thus,
while Officer Kading engaged in several material
misrepresentations and omissions in the Affidavit, the Court does
not find that he engaged in such far-ranging deliberate falsehood
as to justify the use the Court's supervisory powers to exclude
evidence absent a personal constitutional violation.

expectation of privacy in the security office of the Jefferson Store.
George Torres had a reasonable expectation of privacy in the manager's
office of the Alvarado Store.  The Court, however, will reserve ruling
on whether George Torres had a reasonable expectation of privacy in any
of the other locations searched until after the <u>Franks</u> hearing.

With regard to probable cause for the search, the Court finds that
the face of the Affidavit only provided probable cause to search the
Vermont Store for evidence of the incident that the police overheard on
the wiretap where a shoplifter was allegedly assaulted.  The police had
probable cause to seize a picture of that specific detained shoplifter
and the police badge.  There was not, however, probable cause to search
any of the seven other stores or to search for documentary evidence.
The good faith exception most likely does not apply because the
Affidavit was so lacking in probable cause that reliance on it was
unreasonable.  The Court also finds, however, that Officer Kading made
false statements in the Affidavit, which warrants a <u>Franks</u> hearing.
Thus, pending the outcome of the <u>Franks</u> hearing, the Court will make a
final ruling on which evidence is to be suppressed with regard to which
defendant.

Furthermore, as mentioned earlier, it is not entirely clear in all
instances if certain photos were seized in the managers' offices or the
security offices of the stores that were searched.  This obviously
could be important because it could determine whether a specific
picture can be admitted against a specific defendant.

///

///

///

47

1    Thus, if the parties disagree regarding precisely where certain

2  photos were found, the Court will hold an evidentiary hearing at a

3  future date for the purpose of resolving this issue.

4

5

6

7              IT SO ORDERED.

8

9  DATED:    October 17, 2008

10                                    STEPHEN V. WILSON
                                      UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

48